UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CAROLYN SUE ALDINGER
13339 Mercer Drive
Alden, New York 14004,

                 Plaintiff            **COMPLAINT**

        v.                   Civ. No.:

ALDEN STATE BANK
13216 Broadway
Alden, New York 14004,

                 Defendant

_____

     Plaintiff, CAROLYN SUE ALDINGER, by and through her attorneys, GRECO TRAPP, PLLC, for her Complaint against Defendant ALDEN STATE BANK, respectfully states:

## JURISDICTION AND VENUE

     1.     This action is authorized by and instituted under the Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et seq*., and 29 U.S.C. § 201 *et seq.*  Plaintiff invokes the jurisdiction of this Court pursuant to U.S.C. §§ 1331, 1337, and 1343(4).  The matter in controversy arises under an Act of Congress regulating commerce and relating to sex discrimination and it exceeds the sum and value of $10,000.

     2.     The venue of this action is properly placed in the Western District of New York pursuant to 28 U.S.C. § 1391.  Plaintiff, CAROLYN SUE ALDINGER, resides in this District. Upon information and belief, Defendant, ALDEN STATE BANK, was and still is doing business in this District, and the events giving rise to Plaintiff, CAROLYN SUE ALDINGER's claims occurred in this District.

## PARTIES

3.     Plaintiff, CAROLYN SUE ALDINGER (hereinafter "MS. ALDINGER"), is a female citizen of the United States of America and resides in the Town of Alden, County of Erie, and State of New York.

4.     At all relevant times, MS. ALDINGER was an "employee" as defined in § 701(f) of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e(f) and also as defined as 29 U.S.C. § 203(e)(1). She was also an "employee" as defined in the New York State Human Rights Law, Executive Law § 290 *et. seq.*

5.     Upon information and belief, Defendant ALDEN STATE BANK, (hereinafter "the BANK") is a bank chartered by New York State and is licensed and authorized to do business in New York State.  At all times herein relevant, the BANK maintained a place of business at 13216 Broadway, Alden, New York 14004.

6.     At all relevant times, the BANK was and still is an "employer" as defined in § 701(b) of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e(b), 42 U.S.C. § 203(d), and as defined in the New York State Human Rights Law, Executive Law § 290 *et. seq.*

7.     The BANK has continuously been engaged in an industry affecting commerce within the meaning of § 701(h) of Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000e(h).

## STATEMENT OF FACTS

8.     MS. ALDINGER is a female whose date of birth is September 6, 1954.

9.      Upon information and belief, the BANK is a New York State chartered bank with its principal place of business in Alden, New York.  The BANK employs approximately 65 individuals.

10.      On or about November 12, 1973, MS. ALDINGER became employed by the BANK as a teller and received periodic promotions and raises.  Beginning in approximately 1996, she was promoted to a Senior Executive Officer position:  Vice President/Branch Administrator/Human Resources/Security Officer.  She reported to and worked under the direction of Richard D. Koelbl, President/Chief Executive Officer of the BANK/Chairman of the Board of Directors.

11.      MS. ALDINGER held the position of Vice President/Branch Administrator/Human Resources/Security Officer until the BANK terminated her on November 9, 2015, three days before her 42nd employment anniversary.

12.      Throughout her employment, MS. ALDINGER's job performance was always more than satisfactory.  She was publically acknowledged on more than one occasion as a valuable member of the executive team of the BANK.

13.      Richard D. Koelbl is the President - Chief Executive Officer of the BANK as well as Chairman of the Board of Directors.  He owns a large interest in the BANK and is the highest level management employee, and head of its Board of Directors. His office is located at 13216 Broadway, Alden, New York 14004.

14.      John Koelbl is the Vice President/Chief Lending Officer of the BANK and a member of the Board of Directors.  He owns a large interest in the BANK and is the second highest level management employee of the BANK.  His office is located at 13216 Broadway, Alden, New York 14004.

15.     Steven Woodard, is the Vice-President/Chief Financial Officer of the BANK and a member of the Board of Directors.  He owns an interest in the BANK, and is the third highest level management employee.  His office is located at 13216 Broadway, Alden, New York 14004.

16.     MS. ALDINGER owns an interest in the BANK.  The BANK has never had a female member on its Board of Directors.  Richard Koelbl, President/Chief Executive Officer, stated that none of the female stockholders were capable of being a member of the Board of Directors of the BANK.

17.     Hilde Neubauer, Esq., Vice President/In House Counsel/Compliance Officer, was the recording secretary for the Board of Directors.  Richard Koelbl, President/Chief Executive Officer, stated that he did not like Ms. Neubauer being secretary of the Board because she commented on matters being discussed by the Board and that she is supposed to be taking notes and not commenting on matters.  Mr. Koelbl also stated that he needed to find someone to replace Ms. Neubauer as the secretary of the Board.

18.     Female senior executive employees were treated differently than male senior executive employees with regard to compensation.

19.     Male senior executive employees have consistently received increases in compensation in contrast to female senior executive employees.

20.     There is no uniform policy for compensation that applies to all senior executive employees.

21.     In approximately 2006, the BANK, engaged a consulting firm to perform an analysis of wages paid to employees of the BANK compared to other banking institutions of similar size in the same geographic region.

22.     MS. ALDINGER had no knowledge about the BANK's intent to engage a consulting firm to perform an analysis of wages paid to employees of the BANK before this firm was retained.

23.     Based on that analysis, MS. ALDINGER was compared to Human Resources Managers at other banking institutions of similar size, not to Vice President/Branch Administrator/Human Resources/Security Officer.

24.     MS. ALDINGER was told that she was the only employee of the BANK whose compensation fell outside of the expected salary range for their respective position.

25.     MS. ALDINGER's job duties were broader than that of a Human Resources Manager and included Branch Administration duties such as the authority to approve loans, approve cash transfers, and approve the day to day operations of the BANK and also Security Officer duties such as reviewing and implementing both internal and external safety measures and fraud prevention measures.

26.     Following this consulting firm's analysis of wages, Richard Koelbl, President/Chief Executive Officer, advised MS. ALDINGER that she would not be receiving a raise until the salary range for her position matched her current salary.

27.     MS. ALDINGER told Richard Koelbl, President/Chief Executive Officer that the consulting firm's assessment of her job duties was incorrect and her duties were more extensive. Mr. Koelbl told her that she should not complain and should be grateful that she has been overpaid.

28.     MS. ALDINGER did not receive a salary increase from 2007 through her termination on November 9, 2015.  The only other female senior executive employee, Hilde

Neubauer, Esq., Vice President/In House Counsel/Compliance Officer, also failed to receive a salary increase from 2010 until 2015.

29.     MS. ALDINGER's job duties as a senior executive officer, Vice-President, were substantially similar to those of other senior executive officers, Vice-President, such as John Koelbl and Steven Woodard.  Each was responsible for managing operations within the BANK and supervising employees who performed those operations.  John Koelbl was the Chief Lending Officer, reported directly to Richard Koelbl, President/Chief Executive Officer, and supervised employees who reported directly to him.  Steven Woodard was Chief Financial Officer, reported directly to Richard Koelbl, President/Chief Executive Officer, and supervised employees who reported directly to him.  MS. ALDINGER was the Chief Administrative Officer responsible for Branch Administration, Human Resources, and Security, reported directly to Richard Koelbl, President/Chief Executive Officer, and supervised employees who reported directly to her.

30.     Each of these positions required equal skill, effort and responsibility and were performed under similar working conditions.

31.     MS. ALDINGER received pay and benefits which was significantly lower than John Koelbl and Steven Woodard.

32.     In 2009 male senior executive employees were excluded from the Wage Salary Range Management System while female senior executive employees were not.

33.     Male senior executive employees did not receive salary increases from 2010 until 2015.  Beginning in 2011 the male senior executive employees were given significant additional compensation in lieu of salary increases in the form of a "pension" outside of the 401K Plan given to all the BANK employees.  No female senior executive employee was given a pension beyond the 401K Plan.

34.     In 2011, Richard Koelbl, President/Chief Executive Officer received approximately $27,000 in tax deferred non-qualified pension benefits in addition to his salary and other benefits and John Koelbl, Vice-President/Chief Lending Officer received approximately $25,000 in tax deferred non-qualified pension benefits in addition to his salary and other benefits.  No female senior executive received these benefits.

35.     In 2012, Richard Koelbl, President/Chief Executive Officer received approximately $22,000 in tax deferred non-qualified pension benefits in addition to his salary and other benefits; John Koelbl, Vice-President/Chief Lending Officer received approximately $21,000 in tax deferred non-qualified pension benefits in addition to his salary and other benefits; and Steven Woodard, Vice-President/Chief Financial Officer received approximately $4,000 in tax deferred non-qualified pension benefits in addition to his salary and other benefits. No female senior executive received these benefits.

36.     In 2013, Richard Koelbl, President/Chief Executive Officer received approximately $22,000 in tax deferred non-qualified pension benefits in addition to his salary and other benefits; John Koelbl, Vice President/Chief Lending Officer received approximately $21,000 in tax-deferred non-qualified pension benefits in addition to his salary and other benefits; and Steven Woodard, Vice-President/Chief Financial Officer received approximately $7,000 in tax-deferred non-qualified pension benefits in addition to his salary and other benefits. No female senior executive received these benefits.

37.     In 2014, Richard Koelbl, President/Chief Executive Officer received approximately $18,000 in tax-deferred non-qualified pension benefits in addition to his salary and other benefits; John Koelbl, Vice-President/Chief Lending Officer received approximately $17,000 in tax deferred non-qualified pension benefits in addition to his salary and other

benefits; and Steven Woodard, Vice-President/Chief Financial Officer received approximately $10,000 in tax deferred non-qualified pension benefits in addition to his salary and other benefits.  No female senior executive received these benefits.

38.     In 2015, Richard Koelbl, President/Chief Executive Officer received approximately $22,000 in tax-deferred non-qualified pension benefits in addition to his salary and other benefits; John Koelbl, Vice-President/Chief Lending Officer received approximately $21,000 in tax deferred non-qualified pension benefits in addition to his salary and other benefits; and Steven Woodard, Vice-President/Chief Financial Officer received approximately $13,000 in tax deferred non-qualified pension benefits in addition to his salary and other benefits.  No female senior executive received these benefits.

39.     MS. ALDINGER made multiple complaints, both orally and in writing, of sexual discrimination relative to her compensation and benefits to Richard Koelbl, President/Chief Executive Officer, Board of Directors member Mark Reiman, Board of Directors member Neil Hourihan, and other members of the Board of Directors.

40.     When Richard Koelbl, President/Chief Executive Officer, achieved 40 years of service on June 18, 2013 he was recognized by the Board and given an additional week of vacation.

41.     Five months later, on November 12, 2013, MS. ALDINGER achieved 40 years of service.  She was not given an additional week of vacation nor recognized by the Board.

42.     Only after MS. ALDINGER complained on multiple occasions that she was being treated disparately because of her sex was she given an additional week of vacation.

43.     After these complaints, Richard Koelbl, President/Chief Executive Officer, ignored MS. ALDINGER unless she went to his office or directly spoke to him.  He no longer

stopped by her office each morning to say hello as had been his usual routine, nor did he stop by her office at other times.

44.     Female employees were also treated differently than male employees with regard to advancement.

45.     Katherine Koelbl worked at the BANK from June 26, 2000 to June 2014.  During her employment she held the positions of Shredder, Teller, Customer Service Representative, Mortgage Loan Specialist and Compliance Specialist/Trainer.  She held the position of Mortgage Loan Specialist from approximately June 2013 until June 2014.  She left employment at the BANK in September 2014.

46.     Nicole Aldinger worked at the BANK from June 27, 2003 until approximately June 2015.  During her employment she held the position of Shredder, Teller, Head Teller, Customer Service Representative, Mortgage Loan Specialist and secretary for the Asset, Liability Committee-members.  She earned an MBA in June 2012.  She held the position of Mortgage Loan Specialist from approximately June 2014 through June 2015.  As she was not being advanced at the BANK she left her position in June 2015 to further her banking career.

47.      Shawn Gillen worked at the BANK beginning August 13, 2008.  During his employment he held the positions of Teller, Customer Service Representative, and Mortgage Loan Specialist.  He received a Bachelor's of Science Degree in Business Administration in 2012.

48.     During the time Katherine Koelbl and Nicole Aldinger held the position of Mortgage Loan Specialist neither of them were offered the opportunity to go with senior executive officers, John Koelbl, Vice President/Chief Lending Officer, Steven Woodard, Vice

President/Chief Financial Officer and/or Richard Koelbl, President/Chief Executive Officer of the BANK, to appraise houses, was given loan authority, nor offered a salaried position.

49.     Shawn Gillen began as a Mortgage Loan Specialist at the BANK in approximately June 2015.  Within the first few months of this promotion, he was accompanying the senior executive officers John Koelbl, Vice President/Chief Lending Officer, Steven Woodard, Vice President/Chief Financial Officer and/or Richard Koelbl, President/Chief Executive Officer of the BANK, to appraise houses for the BANK's mortgage customers. Further, on March 8, 2016, after being in the position for approximately 9 months, he was promoted to the salaried position of Banking Officer, and given loan authority.

50.     Male employees were permitted to treat female employees in a disparate and discriminatory manner.  In 2014 and before, female employees including, but not limited to Colleen Pautler and Julie Osucha complained to MS. ALDINGER that male employees Robert Englehart, IT Manager, Chris Gust, Assistant Vice-President/Operations, or Jesse Jerge, Loan Operations Manager, spoke to them in a demeaning and discriminatory manner.  MS. ALDINGER spoke to Mr. Englehart, Mr. Gust, and Mr. Jerge about their behavior.  When MS. ALDINGER continued to receive complaints, she spoke to their direct supervisor, Steven Woodard, Vice-President/Chief Financial Officer, to ask him to speak to Mr. Englehart, Mr. Gust, and Mr. Jerge about their behavior.  When MS. ALDINGER continued to receive complaints, she spoke to Richard Koelbl, President/Chief Executive Officer, to ask him to speak to Mr. Englehart, Mr. Gust, and Mr. Jerge about their behavior.  Despite these complaints about the behavior of Mr. Englehart, Mr. Gust, and Mr. Jerge, no action was taken by the BANK to stop this conduct.

51.     On November 26, 2014, the day before Thanksgiving, MS. ALDINGER was given an unfavorable Performance Notation dated November 7, 2014.

52.     Up to that point in time, and throughout her 40 year work record at the BANK, MS. ALDINGER had never received any discipline.  Up to that point in time, MS. ALDINGER had not been made aware of any inadequacies in her job performance.

53.     Prior to being handed the unfavorable Performance Notation by Richard Koelbl, President/Chief Executive Officer, MS. ALDINGER was never told that there were charges or complaints against her nor that an investigation into her conduct was occurring.  At no time before being handed the unfavorable Performance Notation by Richard Koelbl, President/Chief Executive Officer did anyone ever speak to her about the allegations.

54.     MS. ALDINGER was never provided the opportunity to respond to the allegations in the investigation before a determination was rendered and an unfavorable Performance Notation issued.

55.      The BANK policies required employees be given the opportunity to respond to the allegations against them.

56.     MS. ALDINGER complained that she was being treated disparately because of her sex.  She complained that if allegations been made against a male executive at the BANK, he would have been afforded the opportunity to respond to the allegations.

57.     On or about February 4, 2015, MS. ALDINGER confronted Richard Koelbl about his refusal to come into her office, say hello, and see how things were going.  Richard Koelbl told her that she was always busy or on the telephone which is why he did not stop in.  MS. ALDINGER told him that she could not have been busy every time he walked by; she had been in that office for 20 years and had been doing the same job and up until December 12,

2013 he was able to stop in her office daily. The very next day Richard Koelbl walked by her

office, and made an exaggerated wave and stopped in to say good morning.  That was the last

day that he stopped in MS. ALDINGER's office up to and including her termination on

November 9, 2015.

58.     Beginning in February 2015, MS. ALDINGER requested a meeting with the

BANK's Board of Directors Compensation Committee to discuss her unwarranted Performance

Notation and her complaints of sex discrimination.

59.     On or about March 19, 2015, MS. ALDINGER met with the BANK's Board of

Directors Compensation Committee.  The BANK's Board of Directors Compensation

Committee issued a determination that MS. ALDINGER's complaints were unsubstantiated.

60.     Following MS. ALDINGER's meeting with the Compensation Committee,

Steven Woodard, Vice President/Chief Financial Officer, stopped coming into her office to say

hello and ask how everything was going.  For approximately 14 years prior to this Steven

Woodard would come into her office approximately twice a week to say hello and see how

things were going.

61.     Following MS. ALDINGER's meeting with the Compensation Committee, John

Koelbl, Vice President/Chief Lending Officer, stopped coming into her office to say hello.  For

approximately 20 years prior to this John Koelbl, would come into her office approximately

once a week to say hello and see how things were going.

62.     On or about April 15, 2015, MS. ALDINGER called Robert Englehart, the

BANK's Network Administrator, and asked if he would be able to install a computer upgrade

for Micropay on her computer.  He said that Steven Woodard, Vice President/Chief Financial

Officer, was looking into doing a web based payroll which will mean that less people will have

their hands in on it.  Robert Englehart said that he and Steven Woodard went to a meeting a few weeks prior about doing a web based payroll and he was surprised that MS. ALDINGER did not know about it.

63.     On or about August 12, 2015, while MS. ALDINGER was in the office of Colleen Pautler, Assistant Vice President, with Ashley Osucha, Head Teller (approximately 26 years old female).  Richard Koelbl, President/Chief Executive Officer, (approximately 64 years old male) walked in and said to Ashley Osucha that last night he and John Koelbl, Vice President/Chief Lending Officer (approximately 59 years old male), were walking out of the BANK and John Koelbl asked Richard Koelbl if Richard Koelbl wanted to go out for a beer later to which Richard Koelbl replied sure but said to wait a minute because he thought Ashley Osucha was coming over to his house to go swimming. After Richard Koelbl made this statement, he laughed and then walked out of Colleen Pautler's office.  No one else laughed.

64.     Ashley Osucha and Colleen Pautler indicated that they felt awkward as a result of Richard Koelbl's statement.  MS. ALDINGER told Ms. Osucha and Ms. Pautler that Richard Koelbl's remark was inappropriate.

65.     MS. ALDINGER thereafter met with Richard Koelbl and told him that what he said to Colleen Pautler and Ashley Osucha was very inappropriate and he cannot say things like that.  She told him that Ashley Osucha and Colleen Pautler felt awkward.  Richard Koelbl told MS. ALDINGER that he has an understanding with Ashley Osucha and if there's anything she doesn't like that he says that she can tell him that he makes her feel awkward.  MS. ALDINGER repeated to him that he cannot say things like that and it's very inappropriate.  Richard Koelbl said he was sorry and would apologize to both Colleen Pautler and Ashley Osucha.

66.     On or about August 13, 2015, MS. ALDINGER advised Ashley Osucha that if Richard Koelbl, President/Chief Executive Officer, said anything inappropriate to her in the future to write it down and come see her.  Ashley Osucha complained that John Koelbl, Vice President/Chief Lending Officer, and Richard Koelbl, President/Chief Executive Officer, had previously said inappropriate things to her.  She said that John Koelbl had previously grabbed her hand.  She told him to not touch her.  He responded that "If I was going to touch you I wouldn't touch you there."  He made that comment in front of Jaimie Hey.  John Koelbl then said that he couldn't believe he said that in front of a witness.  Following lunch, Jaimie Hey told Ms. Osucha that John Koelbl left a bag of sponge candy for both of them.  Ms. Osucha also said that John Koelbl followed her home from work numerous times and she is afraid to be the last employee to leave the BANK in fear of what Richard Koelbl or John Koelbl may say or do. She reported that on July 4, 2015, she had been driving home and noticed John Koelbl behind her.  She pulled into her parking spot and got her daughter out of the car only to find that he had pulled his car in behind her car.  He asked her if she wanted to do something.  She asked him why he wasn't spending the day with his family and he said that they all had other plans.  She told him that she had plans and went into her apartment and did not leave at all that day in fear that he would see her or would be waiting for her outside her apartment.  She also complained that one day when she wore a skirt to work John Koelbl said "I'd like to lick you starting from your toes and work my way up" and that John Koelbl and Richard Koelbl will look her up and down and tell her how nice she looks which makes her feel very uncomfortable.  She further complained about being very nervous going into John Koelbl and Richard Koelbl's office or their workroom to have them sign paperwork or get approval for something because of what they might say to her without anyone else being able to see or hear them.  She complained that

she has spoken about situations with John Koelbl and Richard Koelbl with Colleen Pautler,

Assistant Vice President and Robin Maier, Mortgage Loan Officer.  They have looked out for

Ashley Osucha by coming into the Head Teller room when they see either John Koelbl or

Richard Koelbl in there when Ashley Osucha is in the Head Teller room.  They also walk out to

the parking lot with Ashley Osucha so she would not be alone walking out to her car.  Ashley

Osucha also reported that Sylvia Sweet, retired Head Teller Supervisor, would look out for her.

She would not leave Ashley Osucha alone in the Head Teller room if John Koelbl walked into

the room.  She reported that Laurie Bradley, Customer Service Representative; Judy

Wiltberger, Teller; and Julie Osucha, Receptionist, may have witnessed John Koelbl in the

Head Teller room or inappropriate conduct.  They also look out for her.  Ashley Osucha stated

that she confided in Megan Bippert, Assistant Head Teller, concerning the inappropriate

conduct of John Koelbl and Richard Koelbl.  Ashley Osucha complained that Richard Koelbl

made a comment to her: "It's not harassment if you like it."  Also, when Richard Koelbl says

something inappropriate to Ashley Osucha he usually follows it with "If that makes you feel

uncomfortable let me know."  Ashley Osucha complained that she did not feel that the BANK's

Board would do anything about this.

  67. On or about August 13, 2015, Kaitlyn Chadbourne (approximately 25 year old

female), who held the position of Customer Service Representative, complained to MS.

ALDINGER that the leadership of the BANK, Richard Koelbl, President/Chief Executive

Officer, and John Koelbl, Vice President/Chief Lending Officer, were acting inappropriately.

She stated that there was sexual harassment and female employees did not feel comfortable at

the BANK anymore.  She also complained that two female employees, Ashley Osucha, Head

Teller, and Jaimie Hey, Assistant Head Teller, were subjected to vulgar sexual remarks, and

were uncomfortable being alone with Richard Koelbl and John Koelbl at work. She complained that John Koelbl, was "predatory" following them around. She complained that inappropriate remarks were made to her by Richard Koelbl, and then he would say "Don't take this the wrong way". She complained that she did not feel comfortable with the BANK's Board and did not believe that they would do anything about it.

68.     On or about August 19, 2015, MS. ALDINGER reported the complaints of Kaitlyn Chadbourne and Ashley Osucha to Hilde Neubauer, Esq., Vice President/In House Counsel/Compliance Officer for the BANK. MS. ALDINGER and Ms. Neubauer met with Kaitlyn Chadbourne relative to her complaint. Kaitlyn Chadbourne relayed her concerns that young women at the BANK were being the victims of sexual harassment by Richard Koelbl and John Koelbl. She felt that the work environment at the BANK was toxic as a result and did not feel comfortable or safe at the BANK.

69.     Immediately following this, MS. ALDINGER and Hilde Neubauer, Esq. met with Ashley Osucha relative to her complaint. MS. ALDINGER relayed to Hilde Neubauer, Esq. the information provided to her by Ashley Osucha during their meeting on or about August 13, 2015 and Ashley Osucha added information as she felt needed. Hilde Neubauer, Esq. told Ashley Osucha that an investigation would be done immediately and Hilde Neubauer, Esq. would contact an outside attorney to assist her.

70.     On or about August 20, 2015, MS. ALDINGER met with Hilde Neubauer Esq. and told her that the women at the BANK are feeling very uncomfortable. Ms. Neubauer said "what did they expect?!"

71.     On or about August 20, 2015, as a part of the investigation, Laurie Bradley, Customer Service Representative; Robin Maier, Mortgage Loan Officer; Colleen Pautler,

Assistant Vice President; Judy Wiltberger, Teller and MS. ALDINGER were interviewed by outside counsel at an offsite location. The following day Ashley Osucha and Kaitlyn Chadbourne were interviewed by outside counsel at an offsite location.

72.     During this investigation, MS. ALDINGER had learned that two other female employees, Jaimie Hey (approximately 26 year old female) and Julie Osucha, (approximately 55 year old female) were victims of sexual harassment by John Koelbl and Richard Koelbl, but neither Jaimie Hey nor Julie Osucha were interviewed.  MS. ALDINGER brought this concern to the attention of Hilde Neubauer, Esq. who advised her that she would advise outside counsel who would contact MS. ALDINGER.

73.     Thereafter, John Koelbl, Vice President/Chief Lending Officer, and Richard Koelbl, President/Chief Executive Officer were interviewed by outside counsel on or about August 26, 2015, on premises at the BANK.

74.     On August 28, 2015, outside counsel met with MS. ALDINGER.  She relayed her concern that no interviews were done of Jaimie Hey and Julie Osucha, who were identified as victims of sexual harassment by both John Koelbl, Vice President/Chief Lending Officer, and Richard Koelbl, President/Chief Executive Officer.  MS. ALDINGER also relayed concerns that the two other identified witnesses, Sylvia Sweet and Megan Bippert, had not been interviewed.  MS. ALDINGER was told she could interview Jaimie Hey and Julie Osucha.  Ms. Aldinger further stated that she could not feel comfortable hiring young females for the teller line knowing what Richard Koelbl and John Koelbl have done.

75.     On or about August 28, 2015, MS. ALDINGER discussed the allegations of sexual harassment and discrimination with Hilde Neubauer, Esq.  MS. ALDINGER stated that she could not feel comfortable hiring young females to be tellers knowing what she knows.  She

stated that if these allegations had been made about Robert Englehart, IT Manager, Chris Gust, Assistant Vice-President/Operations, or Jesse Jerge, Loan Operations Manager, they would have been fired.  She also told Ms. Neubauer that she did not believe the investigation was being handled properly and that all individuals mentioned in the complaints of Ashley Osucha, Kaitlyn Chadbourne, and Jaimie Hey should be interviewed.  MS. ALDINGER asked Ms. Neubauer that if her daughter was working someplace and Ms. Neubauer found out her daughter was a victim of sexual harassment and Ms. Neubauer heard some of the things that were said, would Ms. Neubauer believe that this is being handled properly?  Ms. Neubauer responded that she and MS. ALDINGER needed to protect the BANK.

76.     That same day MS. ALDINGER met with Julie Osucha.  When asked if she wanted to file a sexual harassment complaint, Julie Osucha responded "No, I can't. I need my job. I can't afford to lose my job."  MS. ALDINGER informed Julie Osucha that she could not lose her job by coming forward with a complaint and her response was "No, I can't.  Nothing is going to happen anyhow. Nothing would happen if I came forward."  MS. ALDINGER informed Julie Osucha that going forward if anyone does anything or says anything inappropriate to her she needs to report the incident to her.

77.     That same day MS. ALDINGER also met with Jaimie Hey. When asked if she wanted to file a sexual harassment complaint, Jaimie Hey responded that John Koelbl said pretty much the same things to her that he says to Ashley Osucha.  MS. ALDINGER asked Jaimie Hey if she wanted to file a complaint at this time and she said "No. I think I'm ok."  MS. ALDINGER informed Jaimie Hey that going forward if John Koelbl or anyone says or does anything inappropriate to her that she needs to report the incident to her.

78.     Or about September 3, 2015, Jaimie Hey came into MS. ALDINGER's office and said that she wanted to file a sexual harassment complaint against John Koelbl.

79.     On or about September 9, 2015, MS. ALDINGER gave the responses of Julie Osucha and Jaimie Hey to Hilde Neubauer, Esq., Vice President/In House Counsel/Compliance Officer, along with Jaimie Hey's sexual harassment complaint. Ms. Neubauer subsequently advised MS. ALDINGER that outside counsel would meet with Jaimie Hey on September 11, 2015.

80.     On or about September 11, 2015, MS. ALDINGER was called into Hilde Neubauer, Esq.'s office to speak with her and outside counsel.  Outside counsel advised them that she had spoken with Jaimie Hey and MS. ALDINGER should not have called Jaimie Hey or Julie Osucha into her office to inquire if they had a sexual harassment complaint because the case was closed.  Outside counsel told MS. ALDINGER that going forward if she hears of any inappropriate conduct to bring it to Hilde Neubauer, Esq., Vice President/In House Counsel/Compliance Officer's, attention.  MS. ALDINGER was not to take any further action as it is being handled by them and the BANK's Board.   Subsequently, MS. ALDINGER met Hilde Neubauer, Esq. and told her that all the information that MS. ALDINGER had from Jaimie Hey and Julie Osucha has been given to Hilde Neubauer, Esq. and outside counsel and they had indicated MS. ALDINGER was not to take any further action as it is being handled by them and the BANK's Board.

81.     Other female employees at the BANK were also subjected to discrimination and harassment.  Heather Zuppelli had been asked by Richard Koelbl, President/Chief Executive Officer if he could see naked pictures of her.  Richard Koelbl also told Ms. Zuppelli that he would like to get together with her and that her chest looked nice in a sweater.

82.     After Richard Koelbl, President/Chief Executive Officer and John Koelbl, Vice President/Chief Lending Officer were interviewed by outside counsel on or about August 26, 2015, relative to Ashely Osucha and Kaitlyn Chadbourne's sexual harassment complaints, neither Richard Koelbl nor John Koelbl would look at or talk with MS. ALDINGER unless she directly went into their office and asked them a question.  Richard Koelbl would either turn around and go in the other direction or go into his office, depending on where he was, if he saw MS. ALDINGER.  MS. ALDINGER would say good morning to Richard Koelbl at the BANK and he would not respond in any manner.  On his birthday, October 5, 2015, MS. ALDINGER said Happy Birthday to Richard Koelbl and he ignored her.

83.     On or about September 23, 2015, MS. ALDINGER emailed Richard Koelbl dates for completion of annual performance evaluations for employees as was a normal part of her duties.  Richard Koelbl responded that the dates looked good.  Based upon his written approval she emailed the information to all managers and supervisors.  Thereafter on or about September 26, 2015, Steven Woodard advised MS. ALDINGER that the BANK had decided that they were no longer going to do performance evaluations.  So that same morning MS. ALDINGER sent another email to all managers and supervisors indicating that performance evaluations for 2015 and raises effective January 1, 2016 were not going to be done and that in the near future there would be a meeting explaining how raises were to be calculated.

84.     In October 2015, Board of Directors member Mark Reiman held a meeting with female junior executives Colleen Pautler, Robin Maier and Tracy McMaster.  Following that meeting, Ms. Pautler complained to MS. ALDINGER that only female junior executives were present at that meeting and male junior executives should have also been compelled to attend. MS. ALDINGER recommended that Ms. Pautler speak to Mr. Reiman about her complaints

before he left the building that day.  Ms. Pautler thereafter complained to Mr. Reiman about the

manner in which the male employees treated female employees, talked down to female

employees, and failed to show respect to female employees.  Following that meeting, Mr.

Reiman spoke to Steven Woodard, Vice-President/Chief Financial Officer.  Mr. Woodard met

with Robert Englehart, IT Manager, Chris Gust, Assistant Vice-President/Operations, or Jesse

Jerge, Loan Operations Manager, concerning their behavior toward female employees.

       85.     In anticipation of the BANK's Board meeting, scheduled for November 8, 2015,

at which the compensation and raises of all employees, including MS. ALDINGER's, would be

discussed, she sent a letter via e-mail on November 2, 2015 to Mark Reiman, Member of the

Board and Compensation Committee Chairman, and by hand delivery to Hilde Neubauer, Esq.,

Vice President/In House Counsel/Compliance Officer.  MS. ALDINGER noted that she had

discriminatorily received a Performance Notation dated November 7, 2014 given to her on

November 26, 2014.  She further noted that she was never given the opportunity to respond to

any allegation upon which the Performance Notation was based prior to the issuance of the

Notation.  In contrast, both Richard Koelbl, President/Chief Executive Officer and John Koelbl,

Vice President/Chief Lending Officer, two male senior executive employees, in August 2015,

were interviewed and given the opportunity to respond to allegations of discrimination against

them.  She further noted that she was being treated disparately regarding her compensation.

She wanted to ensure that the unfavorable Performance Notation dated November 7, 2014 be

removed from her personnel file and not be considered by the BANK's Board and

Compensation Committee during November 2015 when they determined annual raises which

would be effective January 1, 2016.

86.     On or about November 5, 2015, MS. ALDINGER complained to Hilde
Neubauer, Esq., Vice President/In House Counsel/Compliance Officer that neither Richard
Koelbl, President/Chief Executive Officer, John Koelbl, Vice President/Chief Lending Officer
nor Steven Woodard, Vice-President/Chief Financial Officer, were talking to her.  MS.
ALDINGER told her that Richard Koelbl hadn't talked to her unless it was a work related
question since on or about December 12, 2013 when she received her 5th week of vacation as a
result of her sexual discrimination complaint.  MS. ALDINGER told her that Steven Woodard
had not talked to her unless it was a work related question since her written complaint of March
19, 2015 to the BANK's Board's Compensation Committee complaining about disparate
treatment in not receiving a raise.  MS. ALDINGER further stated that, since the sexual
harassment investigation in August 2015, Richard Koelbl, John Koelbl and Steven Woodard
completely ignore her.

87.     On November 9, 2015, MS. ALDINGER was terminated.  Richard Koelbl,
Board of Directors Member Mark Reiman, and outside counsel for the BANK told MS.
ALDINGER that she should not have complained about discrimination, should not have
supported the claims of discrimination of other employees, and should not have criticized the
discriminatory practices of the BANK by stating to her that they felt that her heart was no
longer in it for the BANK anymore and that that day was her last day of employment.

88.     On November 9, 2015, as MS. ALDINGER was being escorted from the
BANK, outside counsel for the BANK was overheard to state that "She [MS. ALDINGER]
should have just listened to us.  She should have done what we told her to do."  When MS.
ALDINGER learned of this, she understood it to mean that she should not have complained

about discrimination, should not have supported the claims of discrimination of other employees, and should not have criticized the discriminatory practices of the BANK.

89.     MS. ALDINGER was terminated because of her sex and in retaliation for her complaints of discrimination and harassment, for her active support of the complaints of discrimination and harassment by other employees of the BANK, and for her criticism of the discriminatory practices of the BANK.

90.     MS. ALDINGER reasonably believed that the BANK was engaged in unlawful discrimination and harassment when Ashley Osucha, Kaitlyn Chadbourne, Jaimie Hey, Julie Osucha, and others complained about discrimination and harassment and was further opposing such discrimination and harassment by her active support of those employees' complaints and her criticism of the discrimination, harassment, and investigation into those complaints.

91.     As a result of the actions of the BANK, including but not limited to those described above, the BANK, its agents, servants and/or employees has treated MS. ALDINGER adversely because of her sex and in retaliation for her complaints of discrimination, her active support of the complaints of discrimination and harassment by other employees of the BANK, and criticism of the discrimination, harassment, and investigation into those complaints, and engaged in a knowing, intentional, willful and voluntary course of discriminatory conduct.

92.     As a result of the actions of the BANK, its agents, servants, and employees, including but not limited to those described above, the BANK willfully and intentionally engaged in a course of conduct designed to make it appear as though MS. ALDINGER was discharged for non-discriminatory reasons.

93.     As a result of the actions of the BANK, its agents, servants, and employees, including but not limited to those described above, MS. ALDINGER has been deprived of the terms and benefits of employment.

94.     As a result of the actions of the BANK, its agents, servants, and employees, including but not limited to those described above, MS. ALDINGER has suffered severe emotional distress, degradation, and humiliation.

95.     As a result of the actions of the BANK, its agents, servants, and employees, including but not limited to those described above, MS. ALDINGER has suffered lost wages and benefits and a diminution in her ability to earn income in the future.

### CONDITION PRECEDENT TO ACTION

96.     MS. ALDINGER has complied with all the jurisdictional prerequisites to action pursuant to § 706 of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 2000e-5(f) as follows:

a.      In accordance with the time prescribed by § 706(e) of Title VII of the Civil Rights of 1964 and 42 U.S.C. § 2000e-5(e), on or about April 11, 2016, MS. ALDINGER filed a charge of discrimination with the United States Equal Employment Opportunity Commission (EEOC).

b.      On or about the same date, the EEOC caused a copy of said charge to be filed with the New York State Division of Human Rights (DHR).

c.      On or about July 12, 2017, the EEOC issued a Notice of Right to Sue (Issued on Request) indicating that MS. ALDINGER had the right to sue within 90 days of receipt of the notice, more than 180 days had passed since the filing of the charge and the EEOC

was terminating its processing of the charge.  A copy of the EEOC Notice of Right to Sue is

attached hereto as Exhibit A.

   d.  MS. ALDINGER has filed this action within 90 days of the receipt of the

Notice of Right to Sue from the EEOC.

### AS AND FOR A FIRST CAUSE OF ACTION

   97.  Plaintiff, CAROLYN SUE ALDINGER, repeats and re-alleges each and every

allegation contained in paragraphs "1" through "96" as though fully set forth herein.

   98.  During her time as an employee of Defendant, ALDEN STATE BANK,

Plaintiff, CAROLYN SUE ALDINGER, was subjected to different terms and conditions of

employment than similarly situated male employees.

   99.  Plaintiff, CAROLYN SUE ALDINGER, was subjected to a continuing course

of sex discrimination by Defendants, ALDEN STATE BANK, its agents, servants, and/or

employees.

   100.  Plaintiff, CAROLYN SUE ALDINGER, was required to work in a sexually

hostile environment where she had been harassed by her supervisors, other agents, servants,

and/or employees of Defendant, ALDEN STATE BANK, who were aware that Plaintiff,

CAROLYN SUE ALDINGER, was subjected to a hostile work environment; however,

Defendant, ALDEN STATE BANK, refused to investigate, stop, or prevent the discriminatory

behavior from continuing.

   101.  The effect of the policies and practices pursued by the Defendant, ALDEN

STATE BANK, as alleged above, discriminated against the Plaintiff, CAROLYN SUE

ALDINGER, in ways which resulted in the loss of her job and deprived her of employment

opportunities and otherwise adversely affected her status as an employee because of sex in violation of 42 U.S.C. § 2000e *et. seq.*

102.    Defendant, ALDEN STATE BANK, knew or in the exercise of reasonable diligence should have known of the wrongful and unlawful actions, conduct, and omissions of its agents, servants, and/or employees and took no remedial action.

103.    As a result of Defendant ALDEN STATE BANK's actions, conduct, and omissions, including but not limited to those described above, Defendant, ALDEN STATE BANK, discriminated against Plaintiff, CAROLYN SUE ALDINGER, with respect to her compensation, terms, conditions, and privileges of employment constituting unlawful sex discrimination in violation of § 703(a) of Title VII of the Civil Rights Acts of 1964, as amended, 42 U.S.C. § 2000e-2(a), thereby entitling Plaintiff, CAROLYN SUE ALDINGER, to relief under the provisions of § 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5.

104.    Defendant, ALDEN STATE BANK's wrongful acts, conduct, and omissions were intentional and wanton and done with malice and/or a reckless indifference to Plaintiff, CAROLYN SUE ALDINGER's rights and feelings in violation of § 102(a) of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

105.    As a result of Defendant, ALDEN STATE BANK's actions, conduct, and omissions, including but not limited to those described above, Plaintiff, CAROLYN SUE ALDINGER, incurred damages including, but not limited to, lost back wages, reinstatement to employment or lost future wages, employee benefits, lost employment opportunities, mental anguish, emotional distress, and embarrassment.  Plaintiff, CAROLYN SUE ALDINGER, is thereby entitled to an award of compensatory, punitive, and/or exemplary damages.

106.     As a direct and proximate result of Defendant, ALDEN STATE BANK's wrongful acts, conduct, and omissions, including but not limited to those described above, Plaintiff, CAROLYN SUE ALDINGER, has been damaged in the amount of Two Million Dollars.

107.     Pursuant to § 706(k), 42 U.S.C. § 2000 e-5(k) of Title VII of the Civil Rights Act of 1964, as amended, Plaintiff, CAROLYN SUE ALDINGER, is entitled to reasonable costs and attorneys' fees.

108.     Pursuant to § 102(c) of the Civil Rights Act of 1991, 42 U.S.C. §1981a(c), Plaintiff, CAROLYN SUE ALDINGER, demands a jury trial as to all issues so triable.

## AS AND FOR A SECOND CAUSE OF ACTION

109.     Plaintiff, CAROLYN SUE ALDINGER, repeats and re-alleges each and every allegation contained in paragraphs "1" through "96" as though fully set forth herein.

110.     Plaintiff, CAROLYN SUE ALDINGER, invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a).

111.     Defendant ALDEN STATE BANK, through its agents, servants, and/or employees treated Plaintiff, CAROLYN SUE ALDINGER, adversely because of sex and engaged in a knowing, intentional, willful, and voluntary course of wrongful discriminatory conduct in violation of the Human Rights Law of the State of New York, Executive Law § 290 *et. seq.*

112.     Defendant ALDEN STATE BANK discriminated against Plaintiff, CAROLYN SUE ALDINGER, with respect to compensation, terms, conditions, and privileges of employment because of sex in violation of the Human Rights Law of the State of New York, Executive Law § 290 *et. seq.*

113.    Defendant ALDEN STATE BANK's wrongful acts, conduct, and omissions, including but not limited to those described above, were willful and wanton and done with a reckless disregard of Plaintiff, CAROLYN SUE ALDINGER's rights under the Human Rights Law of the State of New York.

114.    As a result of Defendant ALDEN STATE BANK's actions, conduct, and omissions, including but not limited to those described above, Plaintiff, CAROLYN SUE ALDINGER, incurred damages, including but not limited to lost back wages, reinstatement to employment or lost future wages, employee benefits, lost employment opportunities, mental anguish, emotional distress, and embarrassment.

115.    As a result of Defendant ALDEN STATE BANK's wrongful acts, conduct, and omissions, including but not limited to those described above, Plaintiff, CAROLYN SUE ALDINGER, has been damaged in the amount of Two Million Dollars.

116.    Plaintiff, CAROLYN SUE ALDINGER, demands a jury trial as to all issues so triable.

## AS AND FOR A THIRD CAUSE OF ACTION

117.    Plaintiff, CAROLYN SUE ALDINGER, repeats and re-alleges each and every allegation contained in paragraphs "1" through "96" as though fully set forth herein.

118.    As a result of these offensive acts, including but not limited to those described above, Defendant ALDEN STATE BANK, through its agents, servants, and/or employees, created a sexually hostile working environment in which Plaintiff CAROLYN SUE ALDINGER was intimidated, harassed, and undermined in her attempts to succeed.

119.    Throughout Plaintiff CAROLYN SUE ALDINGER's employment with Defendant ALDEN STATE BANK, Plaintiff CAROLYN SUE ALDINGER, brought the above-described unlawful conduct to the attention of her supervisors.

120.    As a result, Defendant ALDEN STATE BANK, knew or through the exercise of reasonable diligence should have known of the wrongful and unlawful actions, conduct, and omissions of its agents, servants, and/or employees and took no remedial action.

121.    The effects of this hostile working environment were so severe and pervasive that it affected the terms, conditions, and privileges of the Plaintiff, CAROLYN SUE ALDINGER's employment, constituting unlawful sexual harassment in violation of § 703(a) of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e-2(a), thereby entitling Plaintiff, CAROLYN SUE ALDINGER, to relief under the provisions of § 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5(g).

122.    Defendant ALDEN STATE BANK's wrongful acts, conduct, and omissions were intentional and wanton and done with malice and/or a reckless indifference to Plaintiff, CAROLYN SUE ALDINGER's rights and feelings in violation of § 102(a) of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

123.    As a result of Defendant ALDEN STATE BANK's actions, conduct, and omissions, including but not limited to those described above, Plaintiff CAROLYN SUE ALDINGER, incurred damages, including but not limited to, lost back wages, reinstatement to employment or lost future wages, employee benefits, lost employment opportunities, mental anguish, emotional distress, and embarrassment.  Plaintiff, CAROLYN SUE ALDINGER, is thereby entitled to an award of compensatory, punitive, and/or exemplary damages.

124.     As a direct and proximate result of the Defendant ALDEN STATE BANK's wrongful acts, conduct, and omissions, including but not limited to those described above, Plaintiff CAROLYN SUE ALDINGER, has been damaged in the amount of Two Million Dollars.

125.     Pursuant to § 706(k), 42 U.S.C. § 2000 e-5(k) of Title VII of the Civil Rights Act of 1964, as amended, Plaintiff CAROLYN SUE ALDINGER is entitled to reasonable costs and attorneys' fees.

126.     Pursuant to § 102(c) of the Civil Rights Act of 1991, 42 U.S.C. §1981a(c), Plaintiff CAROLYN SUE ALDINGER demands a jury trial as to all issues so triable.

## AS AND FOR A FOURTH CAUSE OF ACTION

127.     Plaintiff CAROLYN SUE ALDINGER repeats and re-alleges each and every allegation contained in paragraphs "1" through "96" as though fully set forth herein.

128.     Plaintiff CAROLYN SUE ALDINGER invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a).

129.     During the course of Plaintiff CAROLYN SUE ALDINGER's employment, Defendant ALDEN STATE BANK, through its agents, servants, and/or employees, subjected Plaintiff CAROLYN SUE ALDINGER to unwelcome comments, insults and other sexually offensive conduct thus creating a hostile work environment and engaged in a knowing, intentional, willful, and voluntary course of wrongful discriminatory conduct in violation of the Human Rights Law of the State of New York, Executive Law § 290 *et. seq.*

130.     Defendant ALDEN STATE BANK's wrongful acts, conduct, and omissions, including but not limited to those described above, were willful and wanton and done with a

reckless disregard of Plaintiff CAROLYN SUE ALDINGER's rights under the Human Rights
Law of the State of New York.

131.     As a result of Defendant ALDEN STATE BANK's actions, conduct, and
omissions, including but not limited to those described above, Plaintiff CAROLYN SUE
ALDINGER incurred damages, including but not limited to, lost back wages, reinstatement to
employment or lost future wages, employee benefits, lost employment opportunities, mental
anguish, emotional distress, and embarrassment.

132.     As a result of Defendant ALDEN STATE BANK's wrongful acts, conduct, and
omissions, including but not limited to those described above, Plaintiff CAROLYN SUE
ALDINGER has been damaged in the amount of Two Million Dollars.

133.     Plaintiff CAROLYN SUE ALDINGER demands a jury trial as to all issues so
triable.

## AS AND FOR A FIFTH CAUSE OF ACTION

134.     Plaintiff CAROLYN SUE ALDINGER repeats and re-alleges each and every
allegation contained in paragraphs "1" through "96" as though fully set forth herein.

135.     Defendant ALDEN STATE BANK treated Plaintiff CAROLYN SUE
ALDINGER adversely because she complained of and opposed unlawful discriminatory
practices on the basis of sex by Defendant ALDEN STATE BANK.

136.     As a result of Defendant ALDEN STATE BANK's actions, conduct, and
omissions, including but not limited to those described above, Defendant ALDEN STATE
BANK has discriminated against Plaintiff CAROLYN SUE ALDINGER with respect to her
compensation, terms, conditions, and privileges of employment and in retaliation for
complaining and opposing unlawful discriminatory practices by Defendant ALDEN STATE

BANK, in violation of § 707 of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. 2000e-(3), thereby entitling Plaintiff CAROLYN SUE ALDINGER to relief under the provisions of § 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5.

137.    Defendant ALDEN STATE BANK's wrongful acts, conduct, and omissions were intentional and wanton and done with malice and/or a reckless indifference to Plaintiff CAROLYN SUE ALDINGER's rights and feelings in violation of § 102(a) of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

138.    As a result of Defendant ALDEN STATE BANK's actions, conduct, and omissions, including but not limited to those described above, Plaintiff CAROLYN SUE ALDINGER incurred damages, including but not limited to, lost back wages, reinstatement to employment or lost future wages, employee benefits, lost employment opportunities, mental anguish, emotional distress, and embarrassment.  Plaintiff CAROLYN SUE ALDINGER is thereby entitled to an award of compensatory, punitive, and/or exemplary damages.

139.    As a direct and proximate result of Defendant ALDEN STATE BANK's wrongful acts, conduct, and omissions, including but not limited to those described above, Plaintiff CAROLYN SUE ALDINGER has been damaged in the amount of Two Million Dollars.

140.    Pursuant to § 706(k) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-5(k) Plaintiff CAROLYN SUE ALDINGER is entitled to reasonable costs and attorney's fees.

141.    Pursuant to § 102(c) of the Civil Rights Act of 1991, 42 U.S.C. § 1981a(c), Plaintiff CAROLYN SUE ALDINGER demands a jury trial as to all issues so triable.

## AS AND FOR A SIXTH CAUSE OF ACTION

142.    Plaintiff CAROLYN SUE ALDINGER repeats and re-alleges each and every allegation contained in paragraphs "1" through "96" as though fully set forth herein.

143.    Plaintiff CAROLYN SUE ALDINGER invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a).

144.    During the course of Plaintiff CAROLYN SUE ALDINGER's employment, Defendant ALDEN STATE BANK, its agents, servants, and/or employees treated Plaintiff adversely in retaliation for her complaints and opposition to unlawful discriminatory conduct and engaged in a knowing, intentional, willful, and voluntary course of wrongful discriminatory conduct in violation of the Human Rights Law of the State of New York, Executive Law § 290 *et. seq.*

145.    Defendant ALDEN STATE BANK discriminated against Plaintiff CAROLYN SUE ALDINGER with respect to compensation, terms, conditions, and privileges of employment  in retaliation for her complaints and opposition to unlawful discriminatory conduct and in violation of the Human Rights Law of the State of New York, Executive Law § 290 *et. seq.*

146.    Defendant ALDEN STATE BANK's wrongful acts, conduct, and omissions, including but not limited to those described above, were willful and wanton and done with a reckless disregard of Plaintiff CAROLYN SUE ALDINGER's rights under the Human Rights Law of the State of New York.

147.    As a result of Defendant ALDEN STATE BANK 's actions, conduct, and omissions, including but not limited to those described above, Plaintiff CAROLYN SUE ALDINGER incurred damages, including but not limited to, lost back and future wages and

employee benefits, lost employment opportunities, mental anguish, embarrassment, and emotional distress.

148.    As a result of Defendant ALDEN STATE BANK's wrongful acts, conduct, and omissions, including but not limited to those described above, Plaintiff CAROLYN SUE ALDINGER has been damaged in the amount of Two Million Dollars.

149.    Plaintiff CAROLYN SUE ALDINGER demands a jury trial as to all issues so triable.

## AS AND FOR A SEVENTH CAUSE OF ACTION

150.    Plaintiff, CAROLYN SUE ALDINGER, repeats and re-alleges each and every allegation contained in paragraphs "1" through "96" as though fully set forth herein.

151.    During the period of Plaintiff, CAROLYN SUE ALDINGER's employment, Defendant, ALDEN STATE BANK, was subject to the provisions of the Equal Pay Act, 29 U.S.C. § 206 *et. seq*.

152.    During Plaintiff, CAROLYN SUE ALDINGER's employment, Defendant, ALDEN STATE BANK, required her to perform the same or substantially the same work as other male employees including, John Koelbl and Steven Woodard, requiring equal skill, effort and responsibility under similar working conditions at the same establishment and paid Plaintiff CAROLYN SUE ALDINGER at a lower rate of pay and benefits than such male employees.

153.    The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity of quality of production or upon a factor other than sex.

154.    Defendant, ALDEN STATE BANK, engaged in policies and practices of employment which discriminated against Plaintiff, CAROLYN SUE ALDINGER, on the basis

of her sex by paying her a lesser rate of pay and benefits than that paid to male employees performing the same or substantially similar job duties which required equal skill, effort and responsibility, and under the same working conditions and the same establishment.

155.    All of the above acts of Defendant, ALDEN STATE BANK, violate 29 U.S.C. § 206 *et. seq*.

156.    Plaintiff, CAROLYN SUE ALDINGER, has no plain, adequate or complete remedy at law to redress the wrongs herein alleged and this action for permanent injunction and other relief is her only means of securing adequate relief.  Plaintiff, CAROLYN SUE ALDINGER, is now suffering and will continue to suffer irreparable injury from these unlawful employment practices.

157.    As a direct and proximate result of Defendant, ALDEN STATE BANK's, wrongful acts, conduct and omissions, including but not limited to those described above, Plaintiff, CAROLYN SUE ALDINGER, has been damaged in the amount of Two Million Dollars.

158.    Plaintiff, CAROLYN SUE ALDINGER, is entitled to reasonable costs and attorneys' fees.

159.    Pursuant to § 102(c) of the Civil Rights Act of 1991, 42 U.S.C. §1981a(c), Plaintiff, CAROLYN SUE ALDINGER, demands a jury trial as to all issues so triable.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

1.    On the first cause of action, Plaintiff demands judgment against Defendant reinstating Plaintiff to employment in her prior or equivalent position, the amount of Two Million Dollars as actual and compensatory damages for loss of revenue, including back pay and in the absence of reinstatement front pay, pain, suffering and mental anguish, and punitive

damages together with interest, costs, expenses, and attorneys' fees, and such other and further relief as to this Court may seem just and proper.

2.     On the second cause of action, Plaintiff demands judgment against Defendant reinstating Plaintiff to employment in her prior or equivalent position, the amount of Two Million Dollars as actual and compensatory damages for loss of revenue, including back pay and in the absence of reinstatement front pay, pain, suffering and mental anguish, together with interest, costs, expenses, and such other and further relief as to this Court may seem just and proper.

3.     On the third cause of action, Plaintiff demands judgment against Defendant reinstating Plaintiff to employment in her prior or equivalent position, the amount of Two Million Dollars as actual and compensatory damages for loss of revenue, including back pay and in the absence of reinstatement front pay, pain, suffering and mental anguish, and punitive damages together with interest, costs, expenses, and attorneys' fees, and such other and further relief as to this Court may seem just and proper.

4.     On the fourth cause of action, Plaintiff demands judgment against Defendant reinstating Plaintiff to employment in her prior or equivalent position, the amount of Two Million Dollars as actual and compensatory damages for loss of revenue, including back pay and in the absence of reinstatement front pay, pain, suffering and mental anguish, together with interest, costs, expenses, and such other and further relief as to this Court may seem just and proper.

5.     On the fifth cause of action, Plaintiff demands judgment against Defendant reinstating Plaintiff to employment in her prior or equivalent position, the amount of Two Million Dollars as actual and compensatory damages for loss of revenue, including back pay

and in the absence of reinstatement front pay, pain, suffering and mental anguish and punitive damages, together with interest, costs, expenses, and attorneys fees and such other and further relief as to this Court may seem just and proper.

6.      On the sixth cause of action, Plaintiff demands judgment against Defendant reinstating Plaintiff to employment in her prior or equivalent position, the amount of Two Million Dollars as actual and compensatory damages for loss of revenue, including back pay and in the absence of reinstatement front pay, pain, suffering and mental anguish, together with interest, costs, expenses, and such other and further relief as to this Court may seem just and proper.

7.      On the seventh cause of action, Plaintiff demands judgment against Defendant reinstating Plaintiff to employment in her prior or equivalent position, the amount of Two Million Dollars as actual and compensatory damages for loss of revenue, including back pay and in the absence of reinstatement front pay, pain, suffering and mental anguish, together with interest, costs, expenses, and attorneys fees and such other and further relief as to this Court may seem just and proper.

Dated:      Buffalo, New York
            October 10, 2017


                              s/Josephine A. Greco
                              Josephine A. Greco, Esq., of Counsel
                              Duane D. Schoonmaker
                              GRECO TRAPP, PLLC
                              Attorneys for Plaintiff
                              Office and Post Office Address
                              1700 Rand Building, 14 Lafayette Square
                              Buffalo, New York 14203
                              Telephone Number:  (716) 856-5800
                              E-mail Address:  jgreco@grecolawyers.com